Thank you, Your Honor. It honors Sarah H. Borer from Atlantic Beach, Florida, appearing on behalf of the appellant Cindy Miner. The law in this circuit is well established that both when assessing a claimant's residual functional capacity and in making a credibility finding, the ALJs are to write their own decisions and cannot rely on the Federal judiciary or the Commissioner's attorneys to fill in the specifics of the rationale. In this case, it appears that the Commissioner has chosen to abandon the need to focus on the ALJ's scanty, obviously deficient rationale and embarks on lengthy post-hoc discussions in an attempt to justify the ALJ's conclusions, which was improper. This Court recently reiterated in the Burrell case decided late last year that we are The Court went on to cite, from the seminal case of Lester v. Chater, that we make the So on the, excuse me, so on the credibility determination, maybe you could be more specific, the ALJ's clear and convincing reasons for rejecting Miner's allegations of disabling pain symptoms and limitations were that the objective medical evidence of record didn't support it, and specifically Dr. Visali, in his consultative examination, reported no significant findings to support her complaint. And second, that there was no evidence that she underwent regular treatment, employing a regimen or therapy consistent with the alleged severity of her complaint. So he gave, she, I guess, also said her activities of daily living, as alleged by Miner, didn't support disabling pain or limitations. So the ALJ gave reasons, so maybe you could address what was wrong with those reasons. Certainly. Actually, the citation is not quite exactly as you have just stated it. The ALJ on page 48 of the decision gave very generic reasons. There's no specificity to them. The objective medical evidence does not support impairments likely to produce pain or limitation. That's all that was said. There was no discussion of what objective evidence, what part of the record was inconsistent. Well, the ALJ specifically mentions Dr. Visali's findings, and Dr. Visali said there's no basis, in my review, there's no basis for disability of this sort. Dr. Visali didn't quite say that as well. Dr. Visali mentioned that, in his opinion, there was a lack of objective evidence to support her complaints of neck pain, back pain, and knee pain. But he made several positive findings through his evaluation. For example, he noted her gait was normal but slow. In the supine position, she had a straight leg raising test cause low back pain. He found a positive phalanx test, which is a test that's used to determine carpal tunnel. In fact, he made inconsistent findings. He said in the body of the report that there was positive phalanx test, and then the RFC assessment said there was negative phalanx test, and found absolutely no limitations of any manipulative limitations. He noted that the axial compression test aggravated low back pain. There was tenderness over the cervical, cervical, and lumbar spines, that she had tender points, that the Patrick's test, which is used to determine arthritis of the hip, causes low back pain on both sides. There was tenderness bilaterally over the upper and lower extremities. She had some sensory positive findings. And also, there was limited range of motion. But notwithstanding that, the examining physician, Dr. Visali, which is the only one we have, says not disabled. No functional limitations. Well, his reports are kind of outrageous. He finds she can lift up to 100 pounds occasionally, 50 pounds frequently. A 49-year-old woman with all the impairments the ALJ found. Obesity, carpal tunnel syndrome. But isn't the ALJ required to defer to the examining physician? Unless there are clear and convincing reasons not to, and there wasn't, was there something in the evidence that would preclude the ALJ or allow the ALJ not to rely on the examining physician? Well, I think the ALJ's, I think the report is inconsistent. I pointed out a pretty major inconsistency regarding the manipulative limitations. He points out on page 424 of the record, he says she had mild limitations on frequent wrist movements, but then he does not find any limitations. That would seem to suggest that she had limitations in frequently using her hand, and yet finds no manipulative limitations. Moreover, he didn't have an opportunity, and there was no discussion of the record that was actually obtained after his report. His report was in February 2009, and subsequent to that date, she underwent testing for her incontinence, and there's objective medical evidence of that, which she did not have the opportunity to review. So she's, so I guess the incontinence evidence in the record said potential stress incontinence, and her response to that was exercises. So how does that support her allegations that she's disabled because of that? Well, incontinence is actually, it is referenced throughout the record, more so than the commissioner has pointed out. Only her allegations, which the ALJ has found not to be credible, right? So if we take out her allegations, because the ALJ found them not to be credible, and only focus on the objective medical evidence from the doctors, what do we have on that? We have the testing that showed that she had the, that she, it was documented that she had the stress incontinence. So stress incontinence is leakage when you cough or sneeze or something like that, so not, doesn't seem to support her allegations that she was disabled because of this. Well, it certainly affects how long, how long you can stay. She testified regarding her leakage. Well, putting aside her allegations. There's other objective evidence, Your Honor. There's a radiology report which shows she had decreased disc heights, and she also had degenerative changes in her C4 through C7 spine. There's a neurological consult that shows she did have positive signs for the carpal tunnel syndrome, which Dr. Vassillo's report also supported. There are nerve conduction studies which showed that they were abnormal, that she had evidence of bilateral nerve, nerve, neuropathy. So there was some objective evidence. Could I, could I maybe get in a question? I think if we look at everything in the light most favorable to your client, which I'm not suggesting is the correct standard here, that you have some arguments to make. But I agree with Judge Okuda that it's important to look at the objective evidence, the things that we can really measure. So many of the testing that you mentioned is really, really boils down to her reports of pain. For carpal tunnel, it's a little different. There's a nerve conduction study. Yes. But there is, for example, even if you look at that, people can have carpal tunnel and have varying degrees of disability or residual functional capacity. And in that instance, he said in his report that she could, she still had normal grip strength was an objective measure, and that she could still, even though she said she would, she could not hold papers and dropped things, said she had no trouble doing that in the office. She could hold a pen and sign her name, for example. So those are the kinds of things I'm looking at that tell me that he had reason to make an adverse credibility determination. Well, we believe that he, the reasons he stated, though, are not specific. He did not. That's pretty specific. Well, that's one of, he gave, I'm sorry, she gave four different reasons, and that particular, and there was no specificity regarding the objective evidence. It was just a very generic finding, generic findings regarding. Maybe you could answer another area that bothered me. I think she reported that she had been advised to have surgery for a couple of her conditions, and they couldn't find any indication in the medical records that she had been advised to have surgery for the conditions where she reported that. She's, I think there was, I think that you're correct on that point. But she had just gone to the doctor recently before the hearing. And that's, and she was, and that was one of the things that was actually mentioned, though, by the, by the doctor that treated her for her incontinence that surgery was an option. But she wanted to first try a more conservative measure before she would consider surgery. Right. But I think what she reported in these proceedings is that she had been, it was recommended that she go have surgery, and that had not, that was not correct. I think, well, the report actually, I can pull it when I have a moment, but the report actually mentioned surgery as an option, but she opted at this point to try the, to try the conservative measures, which is not unusual. People first try a conservative treatment regimen before they try a more invasive treatment regimen. She reported some daily living activities that Judge Okuda ran through. There are others here that he said, you know, from her self-reports, she says she can do these things, and those are inconsistent with some of these subjective findings. That's not what he, actually, if you read his decision, he didn't actually say, he, the ALJ stated in the decision that the claimant did not allege an inability to provide her own care. Now you're getting into the Commissioner's arguments. There was no discussion in the ALJ's decision about daily activities other than her own testimony. When it came down to the credibility finding, he just said, she says, excuse me, the claimant did not allege an inability to provide for her own care. That was the comment. That's, and that's certainly. Well, yes, but in context, it seems to me to be a really fair observation to make because there's no conflicting medical testimony that she offered, right? Well, you don't have to be able to provide for your own care to get disability. That's not a standard. There's no standard that says you have to be incapacitated and bedridden. My point is different, and it's not that complicated. It's that he doesn't have a conflicting medical opinion. So he's going by mostly subjective complaints of pain and comparing that to what she says she can do. What's wrong with that methodology? You're asking, I'm sorry, can you repeat the question? Sure. Am I right that there wasn't a competing, she did not offer a medical expert? No. No, I'm not right? No, there's no medical opinion. And there's no treating physician? No. I mean, the woman is a low-income person, has an SSI claim, she goes to a clinic, and there's no treating physician. Sure, right. And that doesn't mean she loses. I'm just trying to make sure that I understand the record correctly. It just seems in that context, given that and the fact that most of these findings are based on her subjective reports of pain, it seems to me that... Well, there is some, I mean, finding abnormalities on x-rays, that's not nothing. And I mentioned some of those findings. Those are objective evidence. There is some objective evidence to support her complaints. The judge found she could do medium work, which is lifting 50 pounds occasionally, 25 pounds frequently, and standing and walking six hours a day. And this woman has many things wrong with her that are shown. She has the carpal tunnel. She has the issues with her back. There is some objective evidence. It's not that there's no objective evidence. And Dr. Vasili, she attempted to bring all her records to Dr. Vasili, and he didn't want to read the records. So we're not really sure what records he had to look at when he evaluated her. All right. So I'm just going to ask this one more time. I know your time is ticking, but it's not unusual for us. In fairness, I want you to have a chance to respond. It's not unusual for us to see cases where there is some objective medical evidence like degenerative disc disease, right? And the people who have those conditions have a broad spectrum of ability to go on with residual functional capacity. Yes. Right. So we see that all the time. And so that's why it seems to me that her other reports of daily activities, of what she actually can do, become very important in this case. What am I missing? Well, she didn't report very many activities. I'm not sure where you think there were a lot of activities reported. Her life was quite limited. When she did go shopping, she had someone with her who carried the groceries. She didn't have many activities at all. And I think that her limitations were consistent with her statements. And the ALJ in making this credibility finding kind of went over the ‑‑ it was too generic and too general. It didn't go into the specificity that's required. Thank you. Before your adversary gets up, I'm not sure I understand what the condition is that you ‑‑ what is it that you're relying on that is disabling? Well, the incontinence, the incontinence primarily. Also that she has issues with her back. And she has abnormal range of motion that was shown up in Dr. Vasili's report. The ALJ specifically found she has obesity. And there's cases ‑‑ Okay. It's all those things. All those things. I mean, the case, the ALJ found that she has numerous impairments. She suffers from asthma. This is what the judge found. Asthma, carpal tunnel syndrome, arthritis, scoliosis, and obesity. These are the findings the ALJ made. They're the significant findings, and yet found that despite these impairments, she could perform medium work. Okay. Thank you. Good morning, Your Honors. Elizabeth Feer on behalf of Carolyn Colvin, Acting Commissioner of Social Security. I think this case is actually remarkable in the lack of objective evidence that supports any finding of disability. And if you look at the ALJ's decision, the only two ‑‑ well, there are three medical opinions in the record, two from the state agency reviewing physicians and one from Dr. Vasili. And the ALJ's decision actually accepts both of those. She first finds medium, and that's based on Dr. Vasili's examination. But she also, at the time of the hearing, presented Dr. Wen's findings to the vocational expert, and that was for a range of light with some manipulative limitations and some environmental limitations, and the VE testified that there were jobs with that lower residual functional capacity. As for the objective evidence, there's really nothing else in the record. So there's opposing counsel points to diagnoses of various physicians, like X‑ray results and results of various tests, but those aren't translated into functional limitations, either by a physician or by the ALJ. What do we do about that? Well, first of all, Dr. Wen, or Dr. Pham, actually did address the carpal tunnel nerve conduction study. On page 263, he gives an explanation of why he assessed the manipulative limitations, and he says, based on Dr. Keekhaver's nerve conduction study, which was on page 245, that it does show evidence of carpal tunnel, but that same doctor also found normal strength and normal sensation and normal reflexes. So Dr. Pham, at that time, said that only warrants some minor manipulative limitations. And Dr. Wen's decision several months later has pretty much the same exact findings, and the ALJ presented those findings to the vocational expert. That struck me as the most objective indication of an impairment, the nerve conduction, and there's a diagnosis of carpal tunnel, as you indicated. They found that. But I only found one place in the record where they thought her function indicated that, despite that objective evidence, she was still able to perform pretty well, and that was what I indicated earlier, normal grip strength and ability to write. Dr. Vasali. I would also like to point out that Dr. Vasali did not find positive Phalen's, which is a carpal tunnel test, in two occasions, 424, which is her chart discussing the limitations, and at 432, she specifically said it was negative. When she talked about— But she's got a—you're not contesting—she's got a carpal tunnel diagnosis. Yes, yes, absolutely. And even if you find that the medium RFC doesn't properly account for that, you have this alternative finding in here, which does account for the grip issues. So as for the other objective evidence, the radiograph in February 2007 shows degenerative changes in the facet joints, but it really doesn't show anything else. The knee, mild degeneration, cervical spine degeneration with no bony defects. The carpal tunnel shows evidence of it, but then when she's clinically tested, Dr. Vasali specifically said there were no limitations. And as far as we're concerned, this record, the ALGs, although her decision could obviously have been more articulate, more detailed, if you look at what she actually says, you can follow her reasoning, and you can also—the record just absolutely supports either the medium or the lower findings. How about the incontinence issue? That's also very interesting. The claimant, the first time it shows up in the record is literally two days before the hearing. That's on December 15, 2008, page 393. At the hearing, claimant doesn't mention incontinence when the ALJ is questioning her. At page 21, the ALJ specifically lists claimant's impairments. Claimant adds one, but it's not incontinence. The first time it comes up at the hearing is the first question from claimant's attorney. Then the ALJ at the hearing decides she needs more evidence. So it's rather unusual to have a consultative examiner after the hearing. Here, claimant goes to Dr. Vasali and doesn't mention incontinence. If this is something that she's having on the level that she testified, that makes absolutely no sense. And in our opinion, that's a huge credibility factor regarding that. And then when you look at the objective urology test, it says stress incontinence, which is consistent with voiding small amounts of urine during coughing or speech or something like that. She testified what she—she got up three times a night and went through 15 times a day. That she wet herself through her clothes, yes. And she wore feminine napkins instead of diapers. If this is a problem, it seems reasonable that she would have used something appropriate for that. But the other thing about the urology test is it shows that her urethra is normal, that the actually objective findings in that exam are normal. And the things that—the only—the negative things, the stress incontinence, is just nowhere near the level that claimant has testified. Counsel, I asked a little bit ago about instances where the claimant reported that she had been advised to have surgery. Were there two of those? I didn't—I didn't find any in the record. It's true that Dr. No, no, no, no, no, no. Did she twice report that she had been told to have surgery for two different conditions? I know there was one, but were there—did she also report that she had been advised to have surgery for her neck or back? That's my recollection. At the test—at the hearing, she said she was—it was the bladder, the neck, and the carpal tunnel. Three. So three. And you didn't find that memorialized in the medical records anyway. So you think there were three instances of that? That's my—you know, honestly, I'm not absolutely positive, but that is my recollection. Okay. And as far as the doctor—I can't—I'm not sure what his name is—who did the urology exam, the surgery came up in the context of here's what happens in these conditions. It wasn't you need surgery. And as Your Honor pointed out, she opted for home exercises. So that's just not on the level that claimant testified. And as far as the credibility findings go, the ALJ, again, could have been a little more articulate in what she said, but this is not Tricler, it's not Burrell. This is an ALJ who specifically specified reasons for finding the claimant not credible, and every one of them is supported in the record. The objective evidence doesn't support claimant. She had nothing but conservative treatment. It might have been regular, but it was still conservative. And Dr. Visali's specific finding that there were no significant findings on physical exam to support the claimant's subjective complaints. That's a quote—that goes beyond just a doctor finding no support. It's a doctor saying your subjective allegations are unreasonable based on my examination. So unless you have any further questions. No, apparently not. Thank you. All right. Do you have a couple of minutes for rebuttal? On page 457 of the record, when she went in for the study for the incontinence, it does say the options of medications and behavior modification and surgery was discussed. So surgery is referenced in the record on page 457. And this was the objective testing. And the first report of incontinence was not two days prior to the hearing, as the Commissioner has argued. It was actually referenced in her paperwork submitted in connection with her case at pages 129 and 146 of the record when she filled out her paperwork. So she alleged it when the initial paperwork comes in and you ask why you think you can't work, she referenced the incontinence in both of those dates. It's referenced in a medical report in February 2007, one indicating that she'd had incontinence for two months at page 327 of the record, and another indicating she had frequent urination at page 342 of the record. So the Commissioner is not correct in saying this somehow manufactured evidence came to light just before the hearing. There is this historical evidence prior to the hearing of her incontinence. So for you, can you respond to what she said just a minute ago about being sent to have an exam after the hearing and it wasn't mentioned? This was the hearing that you're talking about, Dr. Vasili. That's, you mean the It's the follow-up examination that was, she just, the opposing counsel just described a follow-up examination after the hearing. This was the, Dr. Vasili was a post-hearing consultative examiner. Right. And what opposing counsel just said is that when she went, your client went to that exam, she did not mention incontinence. Is that wrong? I think that's correct. Yes, it is. I'm not, I don't know, I'm not sure why. He was, but he was there to evaluate her back. She was, this was an orthopedic evaluation. At the hearing, the judge says, I'm sending you for an orthopedic evaluation. That's, that's the answer. So this was an orthopedic evaluation by an orthopedic doctor. And it's not unusual you're going for an orthopedic evaluation that you wouldn't think to mention every other problem you have in the world because you're going for a back, to check your orthopedic matters. I understand. I also wanted to mention, as I said before, that even Dr. Vasili, regarding carpal tunnel syndrome, carpal tunnel syndrome says on page 424, she has mild limitations on frequent wrist movements. Right. Now, that would indicate some limitations on frequently using your hand. And despite that, he finds no limitations on that. And he does say. Because there are no clinical findings also. But he's, this is what he says. Mild limitations on, but there is a clinical finding. He did find a positive Phelan's test. But yet he says in his RFC assessment it was negative. What's the site to the positive Phelan's test, please? It's on, it's, the positive Phelan's test was in his report. It's on, I'm sorry, I don't have it right in front of you. But it's right around, it's right after page 4. It's in the pages that run after. It's in his body of his report, which starts at page 428 of the record. Thank you. Thank you. So we do think that there, you know, his, he made some inconsistent findings regarding the carpal tunnel syndrome. We have objective evidence of that. We have him noting there is mild limitations on frequent wrist movements. And with that, coupled with the incontinence, which is documented in the record, we think that the ALJ's findings that this woman can perform medium work cannot be sustained. I would ask that you send the case back for further evaluation of both her residual functional capacity and her subjective symptoms. Thank you. The case of Miner v. Colvin is submitted.
judges: Schroeder, Ikuta, Christen